**TIME, INCORPORATED, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

United States District Court
S. D. New York.
Feb. 19, 1964.

Cravath, Swaine & Moore, New York City, for plaintiff; George G. Tyler, David G. Ormsby, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., Southern District of New York, for defendant; Robert Arum, Asst. U. S. Atty., of counsel.

LEVET, District Judge.

The plaintiff-taxpayer, Time, Inc., seeks by this tax refund action to recover $61,451.40 assessed by the Commissioner as interest on an income tax deficiency of the taxpayer for the year 1944. Time paid the interest assessed and preserved

its right to recover the amount by the timely filing of claims for refund. Both the plaintiff and defendant move for summary judgment.

The entire dispute centers about the date on which interest was to commence. The Commissioner, relying upon the second parenthetical exception of Section 292(b),[1] assessed interest on $683,313[2] of an income tax deficiency of $952,005 from March 14, 1945, the due date of Time's 1944 income tax return. Time claims the second parenthetical exception is inapplicable and the general rule of Section 292(b) precludes the assessment of interest prior to September 14, 1946, one year after Time filed its application for excess profits tax relief under Section 722. The interest assessed between March 15, 1945 and September 14, 1946 amounts to $61,451.40 and is the subject of this action.

While there is no dispute as to the facts, their exposition must await a brief, but necessary, explanation of the interrelationship of the excess profits and income tax laws in effect in 1944.

## I.

The World War II Excess Profits Tax was designed, as its name implies, to tax the abnormally high profits resulting from the large governmental expenditures made for the national defense. H.R.Rep.No.2894, 76th Cong. 3d Sess., 1–2. The basic philosophy of the excess profits tax was to tax all corporate profits and gains over and above what Congress deemed to be a fair and normal return for the particular corporate business. Since it was imposed in addition to the regular income tax, the basic statutory scheme[3] in force for the taxable year 1944 was to effectively segregate a corporation's income into two portions, one subject to the normal income tax, the other to the excess profits tax. This segregation was accomplished by permitting a credit against the corporation's net income of an amount which was to approximate what Congress deemed a fair and normal return. Denominated an "excess profits credit," it determined the amount of net income subject to the income tax but not to the excess profits tax.

Choosing one of the alternate methods the statute provided, Time attempted to determine its excess profits credit by computing its average earnings during the base period of 1936 through 1939. This amount, called the average base period net income, or, as among the initiate, ABPNI, was to be a credit against the earnings subject to the excess profits tax. Simply stated, this excess profits credit was the amount of income subject to the income tax but not to the excess profits tax. By subtracting from its net income the excess profits credit, a corporation determined the amount subject to the excess profits tax.

Congress, foreseeing that the use of an ABPNI for the base period 1936 through 1939 might prove to result in "an excessive and discriminatory tax," provided in Section 722 a procedure by which a taxpayer could seek an increase in its excess profits credit by claiming a constructive average base period net income, CABPNI. The allowance to the taxpayer of any relief under Section 722 would have the automatic effect of reducing its net income subject to the excess profits tax while at the same time increasing the amount of income subject to the income tax. Simply stated, the allowance of Section 722 relief would invariably result in an excess profits tax overassessment and an income tax deficiency.

In conjunction with Section 722, Congress permitted the taxpayer in Section 710(a) (5) to defer the payment of 33% of the amount of tax relief which would result from the Section 722 relief.

---

1. All statutory references are to sections of the Internal Revenue Code of 1939 unless otherwise indicated.

2. All amounts are shown to the nearest dollar.

3. The explanation offered, while sufficient for present purpose, is, as may be expected from so necessarily a convoluted and intricate a tax statute, phrased in very general terms and should be read with this limitation in mind.

## II.

Briefly, the facts are as follows: On September 14, 1945, Time filed its final income and excess profits tax returns for the calendar year 1944. Its income tax return reported the following amounts:

| | | |
|---|---|---|
| Adjusted net income | | $13,515,517 [4] |
| Less: Adjusted excess profits | | |
| Net Income | $10,277,037 | |
| Other Deductions | 211,718 | $10,488,755 |
| Normal-tax net income | | $ 3,026,762 |
| Income Tax Due | | $ 1,217,340 |

On its excess profits tax return, Time reported:

| | |
|---|---|
| Excess Profits net income | $13,136,375 |
| Less: Excess Profits Credit | $ 2,849,338 |
| Adjusted excess profits net income | $10,277,037 |

In determining its excess profits tax liability, Time used an excess profits credit based on its average base period net income (ABPNI) pursuant to Section 713(a) (1). Simultaneously with the filing of its 1944 tax returns, Time filed an application for relief of its 1944 excess profits taxes under Section 722. Alleging that a significant change in the character of its business during the base period of January 1, 1936 through December 31, 1939 made its actual ABPNI an inadequate standard of normal earnings, Time claimed a constructive average base period net income (CABPNI) of $8,959,000. The reduction in excess profits tax which would have resulted if Time's requested relief had been granted would be $5,171,862. As was permitted under Section 710(a) (5), Time elected to defer $1,706,714 (one-third of $5,171,-862) of its excess profits tax liability for 1944 pending final determination of its Section 722 application.

On December 30, 1948, Time filed a refund claim for the year 1944, based on a claimed carryback from the year 1946 of an unused standard excess profits credit.[5] The claimed carryback from 1946 was computed as follows:

| | |
|---|---|
| 1946 Excess profits net income | $ 474,436 |
| Excess profits credit | 2,709,666 |
| Unused excess profits credit | $2,235,230 |

In computing the excess profits credit, Time claimed an average base period net income (ABPNI) of $3,115,743. (Ex. B)

On October 12, 1949, Time filed a second application for relief under Section 722, denominated an "amended and supplemental" application, for the year 1944. In this application Time sought Section 722 relief for the year 1946 and sought to have any resulting 1946 unused excess profits credit carried back and applied to decrease its adjusted excess profits net income for the year 1944. On this application Time claimed a constructive average base period net income (CABPNI) for the year 1946 of $8,936,235 rather than an ABPNI of $3,115,743 used on its 1948 refund claim. On Schedule A–6.2

4. All amounts shown to the nearest dollar.

5. Although the excess profits tax was repealed by Section 122(a) of the Revenue Act of 1945, 59 Stat. 568 (1945) for taxable years beginning after December 31, 1945, the statutes and the regulations pertaining to the tax were continued in effect until 1947 for the purpose of permitting the carrying back of any unused excess profits credit to the two preceding taxable years.

Time recomputed its excess profits net income for 1946 utilizing the CABPNI as follows:

Excess profits net income $ 474,436
Less: Excess profits credit—
based on CABPNI 8,239,134

Unused excess profits credit for 1946 $7,764,698

On November 26, 1956, the Excess Profits Tax Council made a final determination that Time, under Section 722, was entitled to a CABPNI for the years 1942 through 1946 of $5,500,000. This determination had the following effects on Time's income and excess profits tax liability for 1944:

(1) Time's 1945 application for relief under Section 722 resulted in a reduction from excess profits tax liability for 1944 in the aggregate amount of $1,975,406. This amount was first applied to eliminate the liability of $1,706,714 in excess profits tax which plaintiff had deferred under Section 710(a) (5) on its 1944 return, resulting in a refund or credit of excess profits tax for 1944 of $268,691 ($1,975,406 minus $1,706,714). Correspondingly, there resulted an income tax deficiency of $952,005 for the year 1944. The income tax deficiency resulting from the grant of Section 722 relief to Time for 1944 exceeded the excess profits tax overassessment by $683,313.

(2) The increase in the 1946 unused excess profits credit by virtue of a CABPNI of $5,500,000 rather than an ABPNI of $3,115,743, resulted on the carryback of the unused credit to 1944 in an overassessment of $1,936,612 of excess profits tax for the year 1944 and in an income tax deficiency for 1944 of $906,017.

Taken together, the applications resulted in an excess profits tax refund or credit of $2,205,303 ($1,936,612 plus $268,691) and an income tax deficiency of $1,858,022 ($952,005 plus $906,017).

## COMMISSIONER'S INTEREST COMPUTATIONS

### A. Excess Profits Tax Overassessments

The Commissioner assessed interest in Time's favor under Section 3771(g) [6] on the excess profits tax overassessments for the year 1944 attributable to the granting of Section 722 relief in the following manner:

(1) Interest on $268,691 of the overpayment from September 14, 1946, one year from the filing of the 1945 Section 722 relief.

(2) Interest on $1,936,612 of the overpayment from October 12, 1950, a year from the filing of the 1949 Section 722 relief.

### B. Income Tax Deficiencies

With respect to the income tax deficiencies, interest was assessed against Time in the following manner:

(1) On $683,313 of the $952,005 income tax deficiency resulting from the 1945 application, interest was assessed against Time from March 15, 1945, the due date of Time's 1944 income tax return.

(2) On the $268,691 portion of $952,005 deficiency, interest was assessed from September 14, 1946, one year from the date Time filed its claim for Section 722 relief for the year 1944.

(3) With respect to the change in Time's tax liability resulting from the grant of Section 722 relief for the year 1946 and the resultant carryback, the Commissioner assessed interest against Time on the deficiency of $906,017 from

6. In pertinent part, Section 3771(g) provides:
"* * * If any part of an overpayment for a taxable year beginning after December 31, 1941, is determined by the Commissioner to be attributable to the final determination of an applica- tion for relief or benefit under section 722 for any taxable year, no interest shall be allowed or paid with respect to such part of the overpayment for any period prior to one year after the filing of such application, or September 16, 1945, whichever is the later."

October 12, 1950, one year from the date Time filed its application for Section 722 relief for the year 1946.[7]

Time challenges only the interest assessed from March 15, 1945 until September 14, 1946 on the $683,313 portion of the $952,005 income tax deficiency for the year 1944. This amount, $61,451.40, is the subject of this refund suit.

### III.

The assessment of interest in this factual context is governed by Section 292(b) which provided a special rule for determining the date on which interest was to commence for a deficiency resulting from the granting of Section 722 relief.[8]

Basically, the statute established the commencement date for interest on deficiencies resulting from Section 722 as one year after the filing of the Section 722 application. However, this general rule was inapplicable if any deficiency of income tax exceeded any refund or credit of excess profits tax when the taxpayer had chosen to defer payment of any excess profits tax under Section 710(a) (5).

The Commissioner, in determining that interest was to run from March 15, 1945 on the $683,313 portion of the income tax deficiency resulting from the grant of Time's 1945 Section 722 application, relied upon the second parenthetical portion of Section 292(b):

"\* \* \* and excluding, in case the taxpayer has availed itself of the benefits of section 710(a) (5), such portion of a deficiency under Chapter 1 as may be determined by the Commissioner to exceed any refund or credit of excess profits tax arising from the operation of section 722."

Time, on the other hand, contends that the second parenthetical exception in Section 292(b) is inapplicable to this case. The basis of the contention is that, by reason of the relief granted by both the 1945 and 1949 Section 722 applications, the total excess profits tax refund or credit ($2,205,303) exceeds the total income tax deficiency for the year 1944 ($1,858,022), making the general rule rather than the parenthetical exception applicable, and preventing the assessment of any interest prior to September 14, 1946.

The issue is the applicability *vel non* of the second parenthetical exception.

Here, "[a]s is usual in tax cases, each side asserts that its construction accords with the 'plain meaning' of the statute and that its adversary's is in violent contradiction thereof. Although we would not think the latter accusation to be deserved here as to either party, the palm for the closer approach to the letter must go to the Commissioner." Litchfield Securities Corp. v. United States, 325 F.2d 667, 671 (2d Cir. 1963). In choosing between the two readings of the statute, both of which are equally permissible as a matter of language, the reasons sustaining the Commissioner's

---

7. The interest computations terminated on different dates due to the filing of a waiver of restrictions (Form 870–AD). The actual computations were: (a) On $459,137 of the $906,017 deficiency interest from October 12, 1950 to April 23, 1957; (b) On $446,880 of the $906,017 deficiency from October 12, 1950 to September 12, 1957, the 30th day after the filing of Form 870–AD.

8. Section 292. Interest on Deficiencies.
"(b) \* \* \* If any part of a deficiency for a taxable year beginning after December 31, 1941, is determined by the Commissioner to be attributable to the final determination of an application for relief or benefit under section 722 for any taxable year (excluding any portion of a deficiency of excess profits taxes constituting a deficiency by reason of deferment of tax under section 710(a) (5), and excluding, in case the taxpayer has availed itself of the benefits of section 710(a) (5), such portion of a deficiency under Chapter 1 as may be determined by the Commissioner to exceed any refund or credit of excess profits tax arising from the operation of section 722), no interest shall be assessed or paid with respect to such part of the deficiency for any period prior to one year after the filing of such application, \* \* \*."

interpretation result not only from the statutory wording but from a consideration of the entire statutory scheme as well as the applicable case authority.

### 1. The statutory scheme as a whole.

It became rather readily obvious to Congress that the customary interest provisions requiring interest to be paid from the date of overpayment, Section 3771(a–b), and assessed from the due date of the tax, Section 292(a), were unsuited for the overpayments and deficiencies arising from Section 722. See H.R.Rep.No.722, 78th Cong. 1st Sess. 2 (1943). To meet this problem the 78th Congress enacted the complementary provisions of Sections 292(b) and 3771(g), 57 Stat. 601 (1943), designed to govern the assessment of interest on both deficiencies and overpayments arising from the operation of Section 722. As the House Report makes evident, the basic statutory scheme was to provide that for years subsequent to 1941 no interest was to be assessed on deficiencies or paid on overpayments for any period prior to September 16, 1945 and in no event prior to one year from the filing of the Section 722 application.

The House version of Section 292(b), H.R. 3363, 78th Cong. 1st Sess., did not include the two parenthetical exceptions with which the section was finally enacted. The House version simply provided that no interest was to be assessed for periods prior to January 1, 1942 and for subsequent periods, no interest was to be assessed until one year after the filing of the Section 722 applications, or September 16, 1945, whichever is later.

The two parenthetical exceptions of Section 292(b) were inserted by the Senate Finance Committee, whose report, S. Rep. No. 508, 78th Cong. 1st Sess. 2, makes clear their purpose:

"The committee amendment of section 2 is designed to make appropriate provision for application of the section where there has been deferment of part of the excess profits tax under section 710(a) (5) of the code. In general, a taxpayer must pay its tax, computed without any benefit, from the application of section 722. Since, under the bill, taxpayers which have paid their taxes in full, without the application of section 722, will receive any refunds with interest only for the periods provided, taxpayers who have availed themselves of the deferment provided by section 710(a) (5) should be required to pay interest on the amount by which they have underpaid."

The Committee report makes clear that Congress, although permitting the deferment, viewed the tax as due and owing on the due date of the return. Congress sought by the parenthetical exception to have the taxpayer compensate the government for the use of the monies which the Commissioner determined where unpaid for a particular year. This is especially true when one realizes the Congress must have unquestionably been aware of the interrelationship between the normal income tax and the excess profits tax. As has already been seen, the granting of relief under Section 722 would have the automatic effect of reducing the income subject to the excess profits tax with a concomitant excess profits overpayment and an increase in the income subject to the income tax with a concomitant income tax deficiency. The disparity between the income and excess profits tax rates was such in 1944 [9] that where a taxpayer had fully paid its excess tax liability any refund of excess profits tax would normally exceed the corresponding deficiency in income tax. However, where a taxpayer elected to defer a portion of its excess profits tax under Section 710(a) (5), that would not

9. In 1944, the rate of excess profits tax was 95%, Section 710, and the rate of income tax was a total of 47% (31% normal tax by Section 13 and a 16% surtax by Section 15). As the rate of excess profits tax was approximately twice that of the income tax, for every dollar of refund of excess profits tax a deficiency of approximately 50 cents in income tax resulted.

necessarily be true since the refund for the year would first be applied to eliminate the taxes deferred.

The second parenthetical exception was thus intended to assure that the government received interest from the due date of the return to the extent that any deficiency in income tax for a particular taxable year attributable to Section 722 relief exceeded the excess profits tax refund for that year.

Both parties rely upon a further portion of the Senate Committee Report, which provided:

"The committee amendment also rearranges section 2 so that interest provisions will be appropriately applied in case of carryovers and carrybacks of unused excess-profits credits. For taxable years beginning prior to January 1, 1942, no interest shall be allowed or assessed for overpayments or deficiencies attributable to relief under section 722, whether or not the relief arises directly by virtue of the determination of a constructive average base-period net income for the year in question or indirectly through carryovers or carry-backs of the unused excess-profits credit resulting from the determination of a constructive average base-period net income for a prior or subsequent year. For taxable years beginning after December 31, 1941, the general interest rule applicable is that there shall be no interest for the period prior to one year after the application on September 16, 1945, whichever is the later. In general in the case of carryovers, the determination will be for the year to which the carryover is being made, and in the case of carry-backs, it will be for the year from which the unused excess-profits credit is being carried back, but the bill authorizes the Commissioner of Internal Revenue to determine the application to which the part of the overpayment or deficiency is attributable. The bill does not supersede section 3771

(e) of the Code (relating to the period for interest on carry-backs) and its provisions as well as those of the bill may be applicable. In the case of carry-backs, the bill does not allow interest to begin in any case earlier than is provided in section 3771(e), but in certain cases provides for a later date than in that section."

However, the quoted portion is of very little assistance here and "[t]he paucity of its assistance * * * is illustrated by the fact that both parties rely on it." United States v. Zacks, 375 U.S. 59, 68, 84 S.Ct. 178, 11 L.Ed.2d 128 (1963). While, as the portion quoted makes clear, the Senate Committee was concerned with carryovers and carrybacks, it was so in an entirely different context. The Committee was concerned with how the "no interest" rule applicable for years 1940 and 1941 or the interest rule for 1942 and subsequent years was to be applied to carryovers or carrybacks. However, the report is of some assistance, albeit small, in indicating the Congressional intent that carrybacks were to be treated as arising from a subsequent year and were to be treated, interest-wise, in that fashion.

■ Interest in the tax law, as elsewhere, is "to compensate the Government for the delay in payment of the tax." Owens v. Commissioner, 125 F.2d 210, 213 (10th Cir. 1942), cert. denied 316 U.S. 704, 62 S.Ct. 1308, 86 L.Ed. 1772. See also United States v. Childs, 266 U.S. 304, 45 S.Ct. 110, 69 L.Ed. 299 (1924). The parenthetical exceptions seek to do precisely that. Although Congress permitted the deference of a portion of the tax, it nonetheless viewed the tax as due on the due date of the return. Where a taxpayer has deferred the payment of monies properly due the government and a subsequent Section 722 application results in an income tax deficiency which exceeds the excess profits refund, interest is payable from the due date of the return. It was a most reasonable *quid pro quo* to provide that when the Section 722 relief for that par-

ticular year did not, because of the deference, fully pay the income tax deficiency, interest was payable from the due date of the return. The happenstance of a carryback should not alter this salutary statutory scheme.

The Commissioner was required to determine the part of the excess profits tax overassessment and income tax deficiency resulting from the grant of Section 722 relief for Time's taxable year 1944. A separate and distinct computation was also required to determine the part of the excess profits tax overassessment and income tax deficiency resulting from the grant of Section 722 relief for Time's taxable year 1946, which, as part of an unused excess profits credit, was carried back to 1944.

The Commissioner was both within the wording and intent of the statute when, in determining "such portion of a deficiency under Chapter 1 [income tax] as may be determined * * * to exceed any refund or credit of excess profits tax arising from the operation of Section 722," he refused to consider the excess profits tax refund and income tax deficiency resulting from the carryback from 1946 to 1944.

*2. The case authority.*

Time filed two Section 722 applications, each of which sought for a particular year to increase its excess profits credit —that is, the amount of net income subject to the income tax, but not to the excess profits tax. In the terms of art, each application sought a constructive average base period net income, or as it was shorthandedly known, a CABPNI.

The first of these applications was filed in 1945 and sought a CABPNI for the tax year 1944. The second, filed in 1949 and denominated by Time as an "amended and supplemental" application for the year 1944, sought initially a CABPNI for the year 1946 and ultimately sought to carry back any unused excess profits credit to the year 1944.

Obviously, it was only an unused excess profits credit which could be carried back to a prior year. After obtaining its Section 722 relief for the year 1946, Time was left with an unused excess profits tax credit because its excess profits net income for that year was substantially less than its excess profits credit. The 1949 application had effects on the tax year 1944 because of the carryback, not because it established a greater CABPNI for the year 1944.

With this in mind, it becomes apparent that the Commissioner's determination is supported by the case authority. One begins with the proposition, rather firmly established in the tax law, that neither a carryback nor Section 722 relief is so retroactive as to expunge the taxpayer's obligation to pay interest on the deficiency until eliminated. Manning v. Seeley Tube & Box Co., 338 U.S. 561, 70 S.Ct. 386, 94 L.Ed. 346 (1950) and Koppers Co. v. United States, 348 U.S. 254, 75 S.Ct. 268, 99 L.Ed. 302 (1955). In Seeley Tube, it was held that "[t]he subsequent cancellation of the duty to pay this assessed deficiency does not cancel in like manner the duty to pay the interest on that deficiency." Similarly, in Koppers, which involved the operation of Section 722, the interest on an excess profits tax deficiency was not extinguished although the deficiency itself was eliminated by the grant of Section 722 relief.

Time seeks to distinguish these rather analogous cases by urging that in both there was at all times a duty to pay the pre-existing deficiency which was later abated, while here there was no duty to pay the tax until the Section 722 relief caused the deficiency. While factually correct, the distinction is legally immaterial. Here, Time was obligated in 1945 to pay its taxes. It chose, as well it might, to defer one-third of them pending the decision of the Excess Profits Council. During that time, it had the use of the money. Had the Section 722 relief been granted before the tax year 1946, Time would have been obligated to pay interest. To allow it in later years, when it suddenly finds itself with an unused credit, to use this credit to defeat legitimate interest charges, seems unwarranted.

It was these very reasons which prompted the Court of Claims to hold under facts identical to those present here that the Commissioner's computation of interest was proper:

"Where a taxpayer has deferred under Section 710(a) (5) an amount of tax which, without the benefit of Section 722, would be due, we think that only the facts present for that year alone should be used in determining whether or not Section 722 relief results in a deficiency in income tax which exceeds an overassessment of excess profits tax." Industrial Rayon Corp. v. United States, 155 F.Supp. 556, 562, 140 Ct.Cl. 168 (1957).

### 3. 1944 Treasury Bulletin.

■■ The defendant also urges that the Commissioner's present interpretation of the second parenthetical exception is inconsistent with his previous position contained in a Bulletin on Section 722 issued November 2, 1944. Even assuming, without deciding, that the Commissioner's position is inconsistent, the law is clear that the Commissioner of Internal Revenue can retroactively correct an error of law even in cases where a taxpayer has relied on the previous determination to his detriment. Automobile Club of Michigan v. Commissioner, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957). This is especially true where, as here, reliance is placed on a Bulletin intended primarily for the guidance of Treasury personnel. The Bulletin bound neither the Commissioner nor this court to the particular interpretation of the law. In any event, it "cannot compel us to arrive at a result different from that demanded of us by our interpretation of a later Supreme Court decision." Miller v. Commissioner, 2 Cir., 327 F.2d 846.

■ For the foregoing reasons, the plaintiff's motion for summary judgment is denied and the defendant's motion is granted with costs.

Settle judgment on notice.